THE PEOPLE OF THE STATE OF NEW YORK ex rel. JAMES SPEYER, Relator, *v.* JOHN F. GILCHRIST and Others, Constituting the State Tax Commission of the State of New York, Respondents.

Third Department, January 5, 1927.

Taxation — personal income tax — deductions — relator's brother, resident of England, withdrew from relator's firm at beginning of World War — withdrawal was apparently temporary — after peace right to re-enter firm was denied — compromise agreement recited that payment was made for release of right to good will, right to use name and to prospective profits or those accrued — relator assumed obligation of his firm and contends that payment is deductible item from personal gross income — said payment was not for ordinary and necessary business expense within Tax Law, § 360, subd. 1, nor loss incurred in trade or business within subd. 4 — said sum represents capital investment and is not deductible.

The relator and his brother were in partnership in New York prior to the World War. Because of the war, it became necessary for the relator's brother, who resided in England, to sever his relation with the New York firm. This was done in a rather informal manner and later an adjustment and settlement of the financial affairs of the partnership was effected. After the close of the war relator's brother contended that he had the right to re-enter the firm, but this was denied him. Thereafter an agreement was entered into reciting all the facts and stating that in consideration of the amount specified in the agreement the relator's brother released all claims in the good will of the firm, the right to use the family name and the right to profits accrued or prospective. The relator assumed the payment of this obligation on behalf of the partnership and contends that the payment thereof is a proper deduction from his gross income in fixing his personal income tax.

The amount involved here, which was an installment under the last contract made between relator's brother and relator's firm, was not an ordinary and necessary business expense within subdivision 1 of section 360 of the Tax Law, nor was it a loss incurred in trade or business within subdivision 4 of that section, but it represented a capital investment by the partnership in that it was purchasing through a compromise agreement the claimed right of the relator's brother in the good will, name and profits, accrued and prospective, of the firm.

CERTIORARI issued out of the Supreme Court and attested on the 13th day of November, 1925, directed to John F. Gilchrist

and others, constituting the State Tax Commission of the State of New York, commanding them to certify and return to the office of the clerk of the county of Albany all and singular their proceedings had in fixing the personal income tax of the relator.

The determination is that the relator is subject to an additional tax for the calendar year 1922 due to a refusal of the Commission to allow a certain claimed deduction from his net income. The relator, James Speyer, is the senior partner in the banking firm of Speyer & Co., of New York city. As to his distributive share in the partnership net income for 1922, the relator asserts that the additional assessment of his net income from that source is excessive to the extent of $300,000. He asserts that a payment in that amount made by the partnership in 1922 to Sir Edgar Speyer of England, under an agreement settling the latter's claims to a share in the partnership, was a business expense or a loss to said copartnership deductible under the Tax Law (§ 360, subds. 1, 4, as added by Laws of 1919, chap. 627) and further that such payment, by reason of relator's agreement with the partnership to assume it, was properly chargeable against relator's distributive share of the partnership net income and thus was deductible by him in the computation of his personal income tax. These are, in brief, the two propositions involved in the case.

In the year 1914, at the outbreak of the World War, the relator, James Speyer, was associated with his brother, Sir Edgar Speyer, of London, who was a British subject, and with other persons, including a brother-in-law (Eduard Beit von Speyer, of Frankfort, Germany) who was a German subject, in the business of Speyer & Co. of New York city. James Speyer and Sir Edgar Speyer were also associated under the firm name of Speyer Bros., of London. After declaration of war between England and Germany in 1914, the British government, by proclamation, compelled Sir Edgar to withdraw from the firm of Speyer & Co. of New York because a German citizen was a partner. In order to sever all connection with the German partner Sir Edgar retired from Speyer & Co. and James, who remained in partnership with the German in New York, was required to retire from Speyer Bros. of London. These retirements were accomplished by letter and cablegram correspondence. They declared that these partnerships had ceased as of September 9, 1914. In a letter of October 23, 1914, from Sir Edgar to Speyer & Co., acknowledging the receipt of copies of a proposed agreement referring to his withdrawal as a partner, Sir Edgar stated: " I look upon this retirement as only a temporary one and that on the signing of peace the old partnerships will come into force again both in N. Y. and London." The record

does not disclose any further correspondence in reply to that letter. The relator acknowledges its receipt, and then testifies to a formal agreement in writing made June 1, 1916, which appears in the record. That agreement recited that by agreement dated October 5, 1914, Sir Edgar withdrew from Speyer & Co. as of September 9, 1914. The agreement of October 5, 1914, recited simply as follows: " It is hereby agreed, that Sir Edgar Speyer, Bart., of London, England, hereby withdraws as a member of Speyer & Co., of New York, as of the Ninth day of September, 1914." Nothing was stated as to the terms of the withdrawal. The 1916 agreement does not recite how their respective interests in the two partnerships were settled but that " in the adjustment and settlement with the other partners " of Speyer & Co., Sir Edgar was found to be indebted in a certain sum and likewise that James was indebted to Speyer Bros. in a certain sum. James assumed the indebtedness of Sir Edgar and Sir Edgar assumed the indebtedness of James upon certain terms. Both firms accepted these substitutions. While the agreement did recite that it should " constitute a complete settlement and accounting in respect of the co-partnership affairs," it excepted " syndicates, transactions or accounts not then conveniently capable of being closed." It was silent as to the right of Sir Edgar to re-enter the firm at a later time. It was silent as to good will and as to the right to use the firm names. There is nothing expressly stated in the agreement which completely negatives the inference that the retirements were temporary, as expressed in such earlier correspondence as appears in the record. It was an international war barrier alone which removed the right and natural inclinations of the members of this family to continue their associations in a business which, so far as appears, they were carrying on amicably and successfully. It was, therefore, not unnatural that, after the declaration of peace Sir Edgar should lay claim to the right to re-enter the firm of Speyer & Co. and, upon its denial, to claim an unreleased share in the business based upon good will and the right to use the firm name.

Whatever may have been his right to such a further accounting, he did make such a claim in 1921 after peace had been formally declared between the United States and Germany, and after extensive negotiations another agreement in writing under seal was entered into in May, 1922, between Sir Edgar Speyer and the members of Speyer & Co., by which Sir Edgar released all his claims in consideration of $750,000 payable to him in installments. The first installment payable in 1922 is the amount in question in this proceeding. The record contains much discussion as to the negotiations leading up to this formal agreement of 1922, but these

negotiations and the rights of the parties were merged in that written agreement, which thus becomes the real subject-matter which is determinative of the present controversy.

The written agreement of May 15, 1922, between Speyer & Co. of the city of New York, party of the first part, and Edgar Speyer, party of the second part, reads as follows:

" The said party of the first part has been for a long time engaged in the City of New York in the general banking business, and the party of the second part for many years, and until on or about September 9th, 1914, was a partner in said firm. On account of conditions created by the war between Great Britain and Germany, the party of the second part on the said September 9th, 1914, with the consent of the then members of the said firm, retired as a member thereof. He has since maintained that his retirement was upon the condition and with the agreement that he was again to become a member of the firm when the obstacles due to the war had been removed, that his interest in the net profits was to be the same as when he retired and that it was to be reckoned from April, 1917,. and that past and prospective profits were to be considered in estimating damages for any breach of the agreement that he was again to become a member of the firm.

" The party of the first part has denied that the withdrawal from the firm of the party of the second part was made subject to said condition or upon said agreement, and the said firm and its members have refused to admit him as a member or to recognize his claim for damages or accountability on account of the claims aforesaid. As a compromise the party of the first part is willing to make the payments specified below in settlement of all interest in the profits heretofore earned and in commutation of future and prospective profits.

" By agreement dated June 1, 1916, the interests of the party of the second part as a partner in the co-partnership of Speyer & Co. were adjusted upon a final accounting and payment has been made by the said firm to the party of the second part of the amount found to be due to him. The party of the second part claims, however, that said settlement was not intended to and did not include or provide for any credit on account of his interest in the good-will of the firm of Speyer & Co., including the right to use the firm name, and that he is entitled to such credit. The party of the first part has refused to pay to the party of the second part anything on account of said good-will and firm name, contending that it has no substantial value, which the party of the second part denies, and that in any event any interest of the party of the second part therein was included in and released by said set-

tlement of June 1, 1916, which the party of the second part also controverts.

" On account of the foregoing differences a controversy has arisen between the parties hereto which they have agreed to compromise.

" In consideration of the premises and of the mutual covenants herein contained, and for the purpose of settling the controversy above set forth, the parties hereto agree as follows:

" *First.* The party of the first part will, on account of said profits, accrued and prospective, pay to the party of the second part the sum of Seven Hundred and fifty thousand dollars ($750,000), as follows: On or before July 1, 1922, Three hundred thousand dollars ($300,000) thereof in cash or by the delivery of securities acceptable to the party of the second part, of the market value of Three hundred thousand dollars ($300,000), and Four hundred and fifty thousand dollars ($450,000) thereof in installments in cash or by the delivery of securities acceptable to the party of the second part, at their market value, as follows, viz:   *   *   *

" *Second.* The party of the first part hereby agrees to indemnify and save harmless, the party of the second part from and against all damages, charges, expenses, claims or demands whatsoever which the said party of the second part shall or may at any time sustain or that may be asserted against him by any member of the firm of Speyer & Co. by reason of any loss or losses that may have been sustained by the said firm since September 9th, 1914, or may hereafter be sustained by said firm in the transaction of its business.

" *Third.* The party of the second part relinquishes and hereby renounces any right that he may have now or hereafter to re-enter the firm of Speyer & Co.   He also releases any and all right, title and interest that he may have in and to the business and the good will of the said firm of Speyer & Co., including the right to use the said firm name, and any interest in the profits of the said firm heretofore or hereafter earned, and whether distributed or accumulated.   He also agrees that he will not sue, or consent to the use of, his individual name, or become a general or special partner in any copartnership, or a stockholder or officer of any corporation, using in its firm or corporate title the name of Speyer, for the purpose of engaging in any business in the United States or Great Britain. It is intended by this agreement to effect a complete settlement and adjustment of any and all of said claims heretofore asserted or which may hereafter be asserted, between the said firm of Speyer & Co. and each and every member thereof individually, on the one hand, and the party of the second part on the other.

"*Fourth.* The parties of the first and second part hereby release and forever discharge one another (excepting under the obligation for the payment of said instalments provided for above) of and from all manner of actions and causes of action, claims and demands whatsoever, either in law or in equity, which either of the parties have had or may now have against the other.

"*Fifth.* The conditions and stipulations of the foregoing agreement shall apply to and bind the heirs, executcrs, administrators and assigns of the respective parties hereto.

"*In Witness Whereof*, the parties hereto and the members of the said firm of Speyer & Co. have hereunto signed their names and affixed their seals as of the day and year last above written."

On the same date that Speyer & Co. arrived at this settlement with Sir Edgar Speyer, the partnership received a letter from James Speyer wherein he assumed the whole burden of the payments to Sir Edgar. His letter to the other partners of Speyer & Co. reads as follows:

"The claims made by my brother, Sir Edgar Speyer, which have been settled by an agreement of this date, related (1) to the good will and firm name of Speyer & Co., and (2) to his participation after he left the firm in the profits, past and prospective. According to advice of counsel, you as members of the firm might have been affected by these claims and it was necessary that the agreement of settlement should be signed by you. It is my desire that you should have all the benefits accruing from said agreement, but as between you and myself, I assume in behalf of myself and my legal representatives, all the obligations to Sir Edgar Speyer undertaken by Speyer & Co., or by you individually under the terms of said agreement, and I agree to hold harmless, you, your heirs, executors, administrators and assigns from any and all liability on account thereof, I further agree that any payments made under the provisions of said agreement are to be borne by me and charged to my individual account."

*Cadwalader, Wickersham & Taft* [*Henry W. Taft* and *Clarence Castimore* of counsel], for the relator.

*Albert Ottinger, Attorney-General* [*Henry S. Manley, Deputy Attorney-General*, of counsel], for the respondents.

HINMAN, J.   The main question is whether the $300,000 payment is a proper deduction from gross income under the State Personal Income Tax Law even as to the partnership business of Speyer & Co. The right of the relator to claim it as a personal deduction in its entirety presents the ultimate question to be decided. The specific question first presented is whether the payment was for

an ordinary and necessary business expense within the Tax Law, section 360, subdivision 1, or a loss incurred in trade or business within subdivision 4 of that section.

The points raised by the relator are as follows: (1) The law provided that a taxpayer may deduct from gross income, in computing net income, all ordinary and necessary business expenses and all losses incurred during the taxable year in carrying on a trade or business; (2) the above allowable deductions include items such as damages paid for patent infringement, damages paid for personal injury and similar expense items paid out during the taxable year in the course of the taxpayer's business; (3) the payment of $300,000 to Sir Edgar Speyer under the contract of May 15, 1922, between Speyer & Co. and Sir Edgar Speyer was not made for good will or any other capital asset; (4) the payments made by Speyer & Co. to Sir Edgar Speyer under that agreement were made specifically " in settlement of all interest in the profits heretofore earned and in commutation of future and prospective profits;" (5) being a payment in settlement of a disputed claim against Speyer & Co. it was a business expense or loss to Speyer & Co. and properly deductible from gross income of the firm and of the relator by reason of his assumption of it, whether it was paid on account of profits or in settlement of a claim based on good will.

As we read the agreement of May 15, 1922, the payment to be made was a capital sum paid to purchase and extinguish every interest claimed by Sir Edgar Speyer. The relator, himself, in his letter of the same date to the other members of Speyer & Co. assuming the obligations of the settlement, stated: " The claims made by my brother, Sir Edgar Speyer, which have been settled by an agreement of this date, related (1) to the good will and firm name of Speyer & Co., and (2) to his participation after he left the firm in the profits, past and prospective." He had no capital invested in the business at the time. It had been fully withdrawn unless he had retained an interest in good will and firm name. He had performed no labor for the firm. The sum paid could not have been income representing profits from capital or labor except upon the theory that he had retained an interest of some kind in the business and a right to re-enter the firm and enjoy prospective profits at least. If he had any remaining capital invested in the business, it was in good will and firm name and anything paid to him by way of " profits " whether accrued or prospective must have been a recognition of a partnership interest of some sort which had not theretofore been extinguished. The word " profits " as ordinarily used and understood, must be taken

11

to mean the net income from the work in hand. The relator calls our attention to a provision in article 12-B of the Personal Income Tax Regulations of New York State to the effect that amounts paid on account of damages for patent infringement or otherwise, is deductible from gross income. Under this rule, the relator urges that, being a disputed claim, any sum paid in settlement of it was similar to damages paid for infringement of a patent. " Damages " under the patent laws, refers to what the plaintiff lost, and " profits " to what the defendant has earned in the past by the unlawful use of the patented invention. Surely the word " profits " as used in the agreement of May, 1922, between these former partners contemplated more than damages for past profits earned by an unlawful act. The language is: " As a compromise the party of the first part is willing to make the payments specified below in settlement of all interest in the profits heretofore earned *and in commutation of future and prospective profits.*" A judgment in patent infringement would naturally foreclose the earning of future profits by the inclusion therein of a permanent injunction precluding further infringement. In the present case the sum paid was for all interest in the profits, accrued *and prospective*, and was based upon a claim to a capital interest in good will and the use of the firm name. The extinguishment of that interest by the payments made was in the nature of a capital outlay and the purchase price is not deductible as " an ordinary and necessary expense " or as a " loss incurred in trade or business." (*Matter of Lee* v. *Gilchrist*, 215 App. Div. 576; affd., 244 N. Y. 514.) The mere fact that the relator inserted in the agreement, in a paragraph preliminary to the covenants, a statement of denial of the right to re-enter the firm; of refusal to pay anything for good will and firm name; and of resisting any such payment on the ground that any such interest was released by the settlement of June 1, 1916, does not determine the character of the thing paid for. It simply defined the controversy. The covenants set forth the things agreed upon. The things paid for included prospective profits. Sir Edgar expressly relinquished his claimed rights to re-enter the firm. He expressly released whatever rights he had in the business, the good will and the firm name. He relinquished the right to the future use of his name in any business in the United States or Great Britain. Speyer & Co. purchased something of value from him. The controversy as to the right to compel any payment whatsoever undoubtedly lessened the amount of the recovery. If the sum paid included any item for damages which were unrelated to the capital outlay to purchase Sir Edgar's renunciation of his claimed rights, the record affords no basis for the segregation.

If the good will had no substantial value, there is no persuasive proof of that fact in the record. (*Matter of Brown,* 242 N. Y. 1.) In the absence of proof to the contrary, we cannot assume that Sir Edgar's agreement to withdraw his name from the field of competition did not give promise of advantage to Speyer & Co. The burden was upon the relator to prove error and its exact amount. (*People ex rel. Kohlman & Co. v. Law,* 239 N. Y. 346.)

We reach the conclusion that the $300,000 payment, by reason of James Speyer's agreement with Speyer & Co. to assume it, was not a proper deduction by him in the computation of his personal income tax.

The determination should be confirmed, with fifty dollars costs and disbursements.

COCHRANE, P. J., VAN KIRK, MCCANN and DAVIS, JJ., concur.

Determination confirmed, with fifty dollars costs and disbursements.